[No. 15870. Department One. January 24, 1921.]

*In the Matter of the Condemnation for* PHINNEY AVENUE, SEATTLE.[1]

MUNICIPAL CORPORATIONS (267-3)—PUBLIC IMPROVEMENTS — ARBITRARY AND EXCESSIVE ASSESSMENT. It is manifest that straightening out a jog in the street making it more valuable for general use and increasing public traffic over it, affects all property similarly situated, and consequently an assessment of property from which land was taken at seven times the amount assessed against similar tracts, not condemned, is void as arbitrary and made upon a fundamentally wrong basis.

SAME (267-3). Such an assessment against private owners could not be justified by the fact that a portion of the street in front of their lots was in private ownership, which, if asserted, would cut off their access to the street.

Appeal from a judgment of the superior court for King county, Gilliam, J., entered February 5, 1920, confirming a street assessment roll, after a hearing upon objections thereto. Reversed.

[1]Reported in 194 Pac. 977.

*Jackson Silbaugh,* for appellants Rippe *et al.*

*Henry W. Pennock,* for appellant Seattle School District No. 1.

*Walter F. Meier, George A. Meagher,* and *Charles T. Donworth,* for respondent.

FULLERTON, J.—Phinney avenue, a street of the city of Seattle, lying between north Sixty-fifth street and north Sixty-eighth street, extends north and south. As originally dedicated, it was sixty feet in width. In 1909 the city, mistakenly conceiving that there had been no dedication of a street between these places, by ordinance established a street thereover, and directed that the private property necessary for the purpose be acquired by condemnation. The property ordered condemned followed the line of the dedicated street on its west side. On the east side, it extended twenty feet into privately owned property. Condemnation proceedings were had under the ordinance in 1911, and resulted in an award to the persons alleged to be owners of the property. After the entry of this judgment, the city took possession of the property and improved it as a street for its full width. Within a year following the decree of condemnation, the mistake as to the existing street was discovered, whereupon the city petitioned the vacation of, and had vacated, the existing decree, and amended its petition asking for a condemnation of the twenty foot strip then in private ownership. This proceeding came on for hearing in 1919, when verdicts and judgments were entered in favor of the owners for the value of the land taken.

The strip condemned was some six hundred and sixty-six feet in length. Measuring from north to south, the first three hundred and sixteen feet was owned by Seattle School District No. 1; and for the property, the

school district was awarded eleven hundred and fifty-two dollars. The remainder of the strip was the property of one Olaf Nelson, and for his property an award was made of thirteen hundred and ninety-five dollars.

Prior to the entry of the first decree of condemnation, the land owned by Nelson formed a part of a larger tract lying to the east. After the decree was entered and the street improved, Nelson platted the remaining tract into lots and blocks, conforming the westerly ends of the west tier of lots to the street line as it would have been had the decree been allowed to stand and as it was finally delineated by the last decree. These lots between the times of the two decrees passed into other ownerships.

The ordinance authorizing the widening of the street directed that the expense thereof be charged to the property benefited. After the return of the verdicts fixing the amount of the awards and the confirmation thereof by the court, the matter of making the assessments upon the property benefited was referred to the eminent domain commission of the city of Seattle. The commission returned a roll in which they assessed the entire benefits on the property abutting upon the property taken, making no assessment at all upon the property upon the opposite side of the street nor upon property lying either north or south of the property taken. On objection of the owners of the assessed property, this assessment was set aside as arbitrary.

The matter was again referred to the eminent domain commission, and another roll returned in which the property of the school district was assessed at two dollars and twenty-five cents a front foot, the lots above mentioned at from ninety-six to one hundred and three dollars per lot, and the property on the opposite side of the street at eight dollars per lot. To this roll, ex-

ceptions were taken by the school district and by the lot owners on the east side of the street, on the ground that the assessment was in excess of benefits, disproportionate to relative benefits, and fundamentally erroneous and arbitrary because founded on the theory that the property from which the condemned property was taken should bear the burden of the awards. The trial court overruled the objections and confirmed the assessment. This appeal is by the school district and the lot owners on the east side of the street from the order of confirmation.

Phinney avenue, to the south of the condemned land, is eighty feet in width, and the effect of the condemnation proceeding was to widen the street from that point to a point corresponding to the north line of the property of the school district. One of the commissioners, in explaining the difference between the amount of the assessment made on the property on the east side of the improved street and that on the west, after testifying that the property on the west side was probably of the greater value than that on the east because of greater elevation, and that as a "usual procedure," the commission made a difference in the amount of the assessment owing to the side of the street "the job is on," testified, in answer to questions put to him by the attorney for the school district, as follows:

"Q. Now, will you explain to the court what it is that renders the benefit seven times as great to this school property as to the property lying immediately across the street, by reason of making that street 80 feet wide instead of 60?

"A. Well, it was our contention and is yet; it was at the former trial and is now, that the elimination of that jog in the street is of big benefit for all the property concerned on the east side of the street; and that all simmers down to that point; if you want to bring it down, that is just what we figured.

"Q. Now you say—here is our property approximately 350 feet north of the jog—and you say that by putting the jog at the top end of our property instead of having it 350 feet below, we are benefited seven times as much as these people across here; is that the idea?

"A. That is the idea, and I think there is no question about it.

"Q. Is there any difference as to the value of the entire tract with the strip or without the strip?

"A. Well, I will tell you what I consider it; that 20-ft. strip added to the property there certainly didn't give it any additional value.

"Q. It didn't give it any additional value?

"A. No, and figuring backwards on it, the elimination of that strip more than balanced the original value. That is the way I figured it all the way through.

"Q. Do I understand you that your theory is this; that whenever a jog occurs, the man that owns the property where the jog hits, or whose property would be taken if it was taken out, may just as well consider that part beyond the jog as worthless, because some time the city may push the street through, and he lose it. Does your theory go that far?

"A. No, I would not go that far, not in all cases; but we have had so many cases to deal with in the proposition and we have seen it worked out on the ground, but I can say as a general rule that is pretty close to the facts."

It would seem to require no argument to show that, in so far as the school district's property is concerned, the assessment was made upon a fundamentally wrong basis. The only benefits the school district derived from the improvement arose from the fact that the street was thereby made more convenient for its use, and from the further fact, perhaps, that the improvement of any thoroughfare increases public traffic over it, and thus renders it more valuable from the standpoint of a person desirous of purchasing property. But it is at once manifest that benefits of this sort

affect alike all property similarly situated which abuts upon or is adjacent to the street. The benefits cannot be affected by the side of the street "the job is on." Nor can they be affected by the fact that the "jog" removed happens to be on one side of the street instead of on the other.

The benefits arise after the improvement is made—in this instance they arose after the strip condemned was converted into a part of the street—when all property similarly situated stands upon an equality. An assessment proceeding, therefore, which results in the assessment of one tract of property seven times as great as it does another of like area and situation is unjust and arbitrary and should not be allowed to stand. The trial court seemed to feel that the assessment against the school district property was unjust and sought to justify it by saying that "for all practical purposes it was taking money out of one pocket and putting it in another;" meaning, we suppose, that the taxpayer's money will pay the assessment in any event and that it can make but little difference whether the money is taken from the school fund or from some other fund raised by taxation. But the reasoning is inconclusive. Property devoted to school purposes is assessable because it is specially benefited, and because to exempt it would unjustly increase the burdens upon the privately owned property in the assessment district. But no rule of law permits its overassessment merely because the assessment must be paid from public funds.

The assessment on the lots of the private appellants is thought to be justified by the fact that a portion of street in front of their lots was in private ownership, which ownership, if asserted, would cut off their access to the street. But as to these parties, the contention is fanciful rather than real. The owner of the

land who platted the lots platted them with reference to the street as it actually existed, showing thereon that the lots abutted upon an existing street. By this act, he estopped himself from afterwards asserting ownership to the strip to the detriment of the purchasers of the lots and their successors in title. No access to the street, therefore, was granted these owners by the later condemnation proceedings which they did not then possess, and consequently no special benefit to their property was conferred thereby other than the benefit arising from the widening of the street, which, as we have shown, was a common benefit to all the adjacent and abutting property.

The order of confirmation is reversed as to the parties appealing, and the cause is remanded with instructions to set aside the roll as to such parties.

PARKER, C. J., BRIDGES, MACKINTOSH, and HOLCOMB, JJ., concur.